**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

| | | |
|---|---|---|
| **SCOTT VINCENT** | ) | **Case No.** 4:21cv131-DMB-JMV |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **COMPLAINT** |
| | ) | |
| **SYNGENTA AG; SYGENTA CROP** | ) | |
| **PROTECTION AG; SYNGENTA** | ) | **JURY TRIAL DEMANDED** |
| **CORPORATION; SYNGENTA CROP** | ) | |
| **PROTECTION LLC; CHEVRON** | ) | |
| **CORPORATION; PHILLIPS 66; CHEVRON** | ) | |
| **USA, INC.; PHILLIPS 66 COMPANY;** | ) | |
| **CHEVRON PHILLIPS CHEMICAL** | ) | |
| **COMPANY LLC; and CHEVRON PHILLIPS** | ) | |
| **CHEMICAL COMPANY LP,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Plaintiff Scott Vincent, by and through undersigned counsel, brings this civil action for

damages against Defendants Syngenta AG, Syngenta Crop Protection AG, Syngenta

Corporation, Syngenta Crop Protection LLC, Chevron Corporation, Phillips 66, Chevron U.S.A.

Inc., Phillips 66 Company, Chevron Phillips Chemical Company LLC, and Chevron Phillips

Chemical Company LP, and alleges as follows:

## INTRODUCTION

1.      Paraquat[1] is a synthetic chemical compound that since the early 1960s has been

developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in

certain herbicide products ("Paraquat Products")[2] developed, registered, formulated, distributed,

and sold for use in the United States.

_____

[1] Common name: Paraquat dichloride. Chemical name: 1,1'-dimethyl-4,4'-bipyridylium ion.
EPA PesticideChemical Code: 061601.
[2] Paraquat Products sold over the years by Defendants include but are not limited to the following:
Gramoxone, Ortho Paraquat CL, Ortho Dual Paraquat, Starfire, and Cyclone.

2.     Plaintiff brings this action against the Defendants to recover damages for personal injuries and other economic damages resulting from his exposure to Paraquat Products over many years at various places in the State of Mississippi, including Counties within the Northern District of Mississippi.

3.     Defendants are companies and successors-in-interest to companies that designed, manufactured, distributed, and sold Paraquat Products for use in Mississippi, and/or acted in concert with others who designed, manufactured, distributed, and sold Paraquat Products for use in Mississippi.

**PARTIES**

**A.     Plaintiff**

4.     Plaintiff Scott Vincent, is a citizen and resident of the State of Mississippi  who has suffered and continues to suffer from permanent neurological injuries consistent with Parkinson's disease ("Parkinson's") caused by his exposure to Paraquat Products at various places within the State of Mississippi generally, and Counties within the Northern District of Mississippi specifically (*e.g.*, Coahoma County).

5.     Plaintiff used Defendants' Paraquat Products regularly and frequently over a period of many years from 1966 to 2020.

6.     Plaintiff suffers from Parkinson's caused by many years of regular, frequent, prolonged exposure to Defendants' Paraquat Products.

7.     Plaintiff brings this case to recover from the Defendants the compensable damages he has suffered which were directly and proximately caused by his exposure to Defendants' Paraquat Products. Plaintiff also seeks punitive damages under Mississippi law.

**B.     Defendants**

8.     SYNGENTA AG is a foreign corporation organized and existing under the laws

2

of Switzerland with its principal place of business in Basel, Switzerland.

9.     SYNGENTA CROP PROTECTION AG is a foreign corporation organized and existing under the laws of Switzerland with its principal place of business in Basel, Switzerland. SYNGENTA CROP PROTECTION AG is a wholly owned subsidiary of SYGENTA AG.

10.    SYGENTA AG and SYNGENTA CROP PROTECTION AG are collectively referred to as "SYNGENTA AG."

11.    SYNGENTA CORPORATION is a Delaware corporation with its principal place of business in Wilmington, Delaware. SYNGENTA CORPORATION is a subsidiary of Defendant SYNGENTA AG.

12.    SYNGENTA CROP PROTECTION LLC is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina. SYNGENTA CROP PROTECTION LLC is a subsidiary of Defendant SYNGENTA AG.

13.    SYNGENTA CORPORATION and SYNGENTA CROP PROTECTION LLC are collectively referred to as "SYNGENTA CROP."

14.    CHEVRON CORPORATION is a Delaware corporation with its principal place of business in San Ramon, California.

15.    PHILLIPS 66 is a Delaware corporation with its principal place of business in Houston, Texas.

16.    PHILLIPS 66 COMPANY is a Delaware corporation with its principal place of business in Houston, Texas. PHILLIPS 66 COMPANY is a direct wholly owned subsidiary of PHILLIPS 66.

17.    CHEVRON USA, Inc. ("CHEVRON USA") is a Pennsylvania corporation with its principal place of business in San Ramon, California. CHEVRON USA is an indirect wholly owned subsidiary of CHEVRON CORPORATION.

3

18.     CHEVRON PHILLIPS CHEMICAL COMPANY LLC is a Delaware corporation with its principal place of business in The Woodlands, Texas. CHEVRON PHILLIPS CHEMICAL COMPANY LLC is a wholly owned subsidiary of CHEVRON USA and PHILLIPS 66 COMPANY, with CHEVRON USA owning 50% and PHILLIPS 66 COMPANY owning 50%.

19.     CHEVRON PHILLIPS CHEMICAL COMPANY LP is a Delaware corporation with its principal place of business in Bartlesville, Oklahoma. CHEVRON PHILLIPS CHEMICAL COMPANY LP is a subsidiary of CHEVRON PHILLIPS CHEMICAL COMPANY LLC.

20.     CHEVRON PHILLIP CHEMICAL COMPANY LP and CHEVRON PHILLIPS CHEMICAL COMPANY LLC are collectively referred to as "CHEVRON PHILLIPS."

21.     At times in this Complaint, SYNGENTA AG, SYNGENTA CROP PROTECTION AG, SYNGENTA CROP PROTECTION LLC are collectively referred to as "SYNGENTA" or "SYNGENTA DEFENDANTS."

22.     At times in this Complaint, CHEVRON CORPORATION, PHILLIPS 66, PHILLIPS 66 COMPANY, CHEVRON USA, INC., CHEVRON PHILLIPS CHEMICAL COMPANY LLC, and CHEVRON CHEMICAL COMPANY LP are collectively referred to as "CHEVRON" or the "CHEVRON DEFENDANTS."

23.     From approximately May 1964 through approximately June 1981, Imperial Chemical Industries Limited ("ICI Limited") and certain ICI Limited subsidiaries, each of which was a predecessor of Defendants SYNGENTA AG and/or Defendants SYNGENTA CROP, were engaged, directly, acting in concert with each other, and/or acting in concert with CHEVRON PHILLIPS, in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in Paraquat Products, and developing, registering,

4

formulating, and distributing Paraquat Products, for sale and use in the U.S., including Mississippi ("the U.S. paraquat business").

24.    From approximately June 1981 through approximately September 1986, Imperial Chemical Industries PLC ("ICI PLC") and certain ICI PLC subsidiaries, each of which was a predecessor of Defendant SYNGENTA AG and/or Defendants SYNGENTA CROP, were engaged, directly, acting in concert with each other, and/or acting in concert with Defendant CHEVRON PHILLIPS, in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in Paraquat Products, and developing, registering, formulating, and distributing Paraquat Products, for sale and use in the U.S., including Mississippi ("the U.S. paraquat business").

25.    From approximately May 1964 through approximately September 1986, Chevron Chemical Company, a predecessor of Defendant CHEVRON USA was engaged, directly and/or acting in concert with ICI, in all aspects of the U.S. paraquat business.

26.    Between approximately May 1964 and approximately September 1986, ICI manufactured and sold paraquat to CHEVRON DEFENDANTS ("ICI-CHEVRON paraquat") for use by Chevron Defendants, and others to which CHEVRON DEFENDANTS distributed it, as an active ingredient in Paraquat Products that Chevron Defendants and others formulated and distributed for sale and use in the U.S., including Mississippi ("ICI-CHEVRON Paraquat Products").

27.    From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SYNGENTA CROP) initially, then other SYNGENTA AG predecessors and certain subsidiaries of each (including predecessors of SYNGENTA CROP), and most recently SYNGENTA AG and certain SYNGENTA AG subsidiaries (including SYNGENTA CROP), have been engaged, directly and/or acting in

5

concert with each other, in all aspects of the U.S. paraquat business.

28.     From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SYNGENTA CROP) initially, then other SYNGENTA AG predecessors and certain subsidiaries of each (including predecessors of SYNGENTA CROP), and most recently SYNGENTA AG and certain SYNGENTA AG subsidiaries (including SYNGENTA CROP), have manufactured paraquat ("ICI-SYNGENTA paraquat") for their own use, and for use by others to which they distributed it, as an active ingredient in Paraquat Products that SYNGENTA CROP and its predecessors and others have distributed for sale and use in the U.S., including Mississippi ("ICI-SYNGENTA Paraquat Products").

**i.      Syngenta Defendants**

29.     In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI PLC").

30.     In or about 1971, ICI PLC created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively, "ICI Americas").

31.     In or about 1992, ICI PLC merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI PLC, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

32.     In 1993, ICI PLC demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca

6

Group PLC as its ultimate parent company.

33.     As a result of ICI PLC's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

34.     Before ICI PLC's demerger and creation of the Zeneca Group, ICI PLC had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides for use in the United States.

35.     As a result of ICI PLC's demerger and creation of the Zeneca Group, ICI PLC's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

36.     After ICI PLC's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

37.     As a result of ICI PLC's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI PLC and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

38.     In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

39.     As a result of the merger that created the Novartis Group, Ciba-Geigy

7

Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York, was merged into, or continued its business under the same or similar ownership and management as, Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

40.     In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.

41.     In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant Syngenta AG as the ultimate parent company.

42.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SYNGENTA AG.

43.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.

44.     Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

45.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their

8

business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SYNGENTA AG organized under the laws of the State of Delaware.

46.     In 2010, SCPI was converted into Defendant SYNGENTA CROP PROTECTION LLC, a subsidiary of SYNGENTA AG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, Mississippi.

47.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor Novartis AG.

48.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor AstraZeneca PLC.

49.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor Zeneca Group PLC.

50.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

51.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor ICI Bioscience Ltd.

52.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor Plant Protection Ltd.

53.     SYNGENTA CROP is a successor by merger or continuation of business to its corporate predecessor SCPI.

54.     SYNGENTA CROP is a successor by merger or continuation of business to its corporate predecessor NCPI.

55.     SYNGENTA CROP is a successor by merger or continuation of business to its

corporate predecessor Ciba-Geigy Corporation.

56. SYNGENTA CROP is a successor by merger or continuation of business to its corporate predecessor Zeneca Inc.

57. SYNGENTA CROP is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

58. SYNGENTA CROP does substantial business with respect to the Paraquat Products in the State of Mississippi, including Counties within the Northern District of Mississippi, including the following:

    a. markets, advertises, distributes, sells, and delivers Paraquat to distributors, dealers, applicators, and farmers in the State of Mississippi, including Counties within the Northern District of Mississippi;

    b. secures and maintains the registration of Paraquat and other pesticides with the EPA to enable itself and others to manufacture, distribute, sell, and use the Paraquat Products in the State of Mississippi, including Counties within the Northern District of Mississippi; and

    c. performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of Paraquat in the State of Mississippi, including Counties within the Northern District of Mississippi.

59. SYNGENTA AG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.

60. SYNGENTA AG is a management holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SYNGENTA CROP.

61.     SYNGENTA CROP PROTECTION AG, a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SYNGENTA AG's direct, wholly owned subsidiaries.

62.     SYNGENTA CROP PROTECTION AG employs the global operational managers of production, distribution, and marketing for the Syngenta Group's Crop Protection Division.

63.     SYNGENTA CROP PROTECTION AG is the "nerve center" through which SYNGENTA AG manages the entire Syngenta Group.

64.     SYNGENTA CROP PROTECTION AG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

65.     SYNGENTA CROP PROTECTION AG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

66.     Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

67.     SYNGENTA AG is the indirect parent of SYNGENTA CROP through multiple layers of corporate ownership.

68.     Before SCPI was converted to SYNGENTA CROP, it was incorporated in Delaware, had its principal place of business in Mississippi, and had its own board of directors.

69.     SYNGENTA CROP's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

70.     SYNGENTA AG has purposefully organized the Syngenta Group, including SYNGENTA CROP, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

11

71.     Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SYNGENTA AG in fact exercises an unusually high degree of control over its country-specific business units, including SYNGENTA CROP, through a "matrix management" system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

72.     The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

73.     SYNGENTA AG controls the actions of its far-flung subsidiaries, including SYNGENTA CROP, through this global "functional" management structure.

74.     SYNGENTA AG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SPLLC.

75.     The SEC consists of the CEO and various global Heads, which currently are:

      a.     The Chief Executive Officer;

      b.     Group General Counsel;

      c.     The President of Global Crop Protection;

      d.     The Chief Financial Officer;

      e.     The President of Global Seeds; and

      f.     The Head of Human Resources.

76.     SIAG employs all of the members of the SEC.

77.     Global Syngenta Group corporate policies require SYNGENTA AG subsidiaries, including SPLLC, to operate under the direction and control of the SEC and other

12

unincorporated global management teams.

78.     SYNGENTA AG's board of directors meets five to six times per year.

79.     By contrast, SCPI's board of directors rarely meet, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SYNGENTA CROP.

80.     Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

81.     Since SCPI became SYNGENTA CROP, decisions that are nominally made by the board or managers of SYNGENTA CROP in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

82.     Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

83.     Since SCPI became SYNGENTA CROP, the appointment and removal of the manager(s) of SYNGENTA CROP continues to be directed by the SEC or other Syngenta Group global or regional managers.

84.     The management structure of the Syngenta Group's CP Division, of which SYNGENTA CROP is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

85.     Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SYNGENTA CROP President Vern Hawkins), and various global corporate function Heads.

86. The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

87. Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Group's U.S. and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

88. The North America Regional Leadership Team is chaired by SYNGENTA CROP's president and includes employees of SYNGENTA CROP and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

89. The Syngenta Group's U.S. and Canadian CP companies, including SYNGENTA CROP, report to the North America Regional Leadership Team, which reports to the CP Leadership Team, which reports to the SEC, which reports to SYNGENTA AG's board of directors.

90. Some members of the North America Regional Leadership Team, including some SYNGENTA CROP employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.

91. Syngenta Group global Heads that supervise SYNGENTA CROP employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

92. The Syngenta Group's functional reporting lines have resulted in employees of companies, including SYNGENTA CROP, reporting to officers of remote parent companies,

14

officers of affiliates with no corporate relationship other than through SYNGENTA AG, or officers of subsidiary companies.

93.     SYNGENTA CROP performs its functions according to its role in the CP Division structure:

        a.      CP Division development projects are proposed at the global level, ranked, and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

        b.      New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

        c.      These products are then tested by other Syngenta Group companies, including SYNGENTA CROP, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

        d.      Syngenta Group companies, including SYNGENTA CROP, do not contract with or compensate each other for this testing;

        e.      Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

        f.      If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SYNGENTA CROP, decide whether to sell the product;

        g.      Decisions to sell the product must be approved by the SEC;

h.    The products that are sold all bear the same Syngenta trademark and logo.

94.    SYNGENTA CROP is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SYNGENTA AG and applicable to all Syngenta Group companies.

95.    These "reserved powers" require Syngenta Group companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.

96.    For example, although SYNGENTA AG permits Syngenta Group companies to handle small legal matters on their own, under the "reserved powers" system, SYNGENTA AG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SYNGENTA CROP, if their value exceeds an amount specified in the "reserved powers."

97.    Similarly, the appointments of senior managers at SYNGENTA CROP must be approved by higher levels than SYNGENTA CROP's own management, board of directors, or even its direct legal owners.

98.    Although SYNGENTA CROP takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

99.    Although SYNGENTA AG subsidiaries, including SYNGENTA CROP, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.

100.    SYNGENTA AG and the global management of the Syngenta Group restrict the authority of SYNGENTA CROP to act independently in areas including:

a.    Product development;

b.    Product testing (among other things, SYNGENTA AG and the global

16

management of the Syngenta Group require SYNGENTA CROP to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SYNGENTA CROP submits to the EPA in support of the registrations of paraquat and other pesticides);

      c.      Production;

      d.      Marketing;

      e.      Sales;

      f.      Human resources;

      g.      Communications and public affairs;

      h.      Corporate structure and ownership

      i.      Asset sales and acquisitions

      j.      Key appointments to boards, committees, and management positions;

      k.      Compensation packages;

      l.      Training for high-level positions; and

      m.      Finance (including day-to-day cash management) and tax.

101. Under the Syngenta Group's functional management system, global managers initiate, and the global Head of Human Resources oversees, international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

102. Under this international assignment program, at the insistence of Syngenta Group global managers, SYNGENTA CROP officers and employees have been "seconded" to work at other SYNGENTA AG subsidiaries, and officers and employees of other Syngenta Group

17

subsidiaries have been "seconded" to work at SYNGENTA CROP.

103.    The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.

104.    The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SYNGENTA AG's subsidiaries, including SYNGENTA CROP, to the interests of the Syngenta Group as a whole.

105.    Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SYNGENTA CROP, holds the cash on account, and lends it to other subsidiaries that need liquidity.

106.    The Syngenta Group's global treasury policy does not allow SYNGENTA AG subsidiaries such as SYNGENTA CROP to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

107.    Syngenta Group Treasury also decides whether SYNGENTA CROP will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

108.    SYNGENTA CROP's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

109.    SYNGENTA CROP does substantial business in the State of Mississippi, including Counties within the Northern District of Mississippi, and it markets, advertises, distributes, sells, and delivers chemical products, piping, and plastics to distributors, dealers, and end users in the State of Mississippi, including Counties within the Northern District of Mississippi.

110.    SYNGENTA CORPORATION does substantial business in the State of Mississippi, including Counties within the Northern District of Mississippi, and it markets, advertises, distributes, sells, and delivers chemical products, piping, and plastics to distributors,

18

dealers, and end users in the State of Mississippi, including Counties within the Northern District of Mississippi.

111.    SYNGENTA CROP PROTECTION LLC is registered to do business in the State of Mississippi.

112.    SYNGENTA CORPORATION is registered to do business in the State of Mississippi.

**ii.      Chevron Defendants**

113.    Chevron Chemical Company was a corporation organized in 1928 under the laws of the State of Delaware.

114.    In 1997, Chevron Chemical Company was merged into Chevron Chemical Company LLC, a limited liability company organized under the laws of the State of Delaware.

115.    In 2000, Chevron Chemical Company LLC was merged into or continued to operate under the same or similar ownership and management as Defendants CHEVRON PHILLIPS.

116.    Defendants CHEVRON PHILLIPS are successors by merger or continuation of business to their corporate predecessor Chevron Chemical Company.

117.    CHEVRON PHILLIPS does substantial business in the State of Mississippi, including Counties within the Northern District of Mississippi, and it markets, advertises, distributes, sells, and delivers chemical products, piping, and plastics to distributors, dealers, and end users in the State of Mississippi, including Counties within the Northern District of Mississippi.

118.    Defendant CHEVRON USA is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in San Ramon, California.

119.    CHEVRON USA is registered to do business in Mississippi, with the office of its registered agent in Raleigh, Mississippi.

120.    Defendant PHILLIPS 66 COMPANY is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Houston, Texas.

121.    PHILLIPS 66 COMPANY is registered to do business in Mississippi, with the office of its registered agent in Raleigh, Mississippi.

122.    PHILLIPS 66 COMPANY is a direct, wholly owned subsidiary of Defendant PHILLIPS 66.

123.    CHEVRON USA and PHILLIPS 66 COMPANY jointly own and control the operations of CHEVRON PHILLIPS.

124.    CHEVRON PHILLIPS is governed by a board of directors. Any decision by the board of directors must be approved by both CHEVRON USA and PHILLIPS 66 COMPANY

125.    CHEVRON USA is an indirect, wholly owned subsidiary of CHEVRON CORPORATION.

126.    In the mid-2000s, CHEVRON USA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical Company and Chevron Chemical Company LLC arising from Chevron Chemical's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of Paraquat Products in the United States as alleged in this Complaint.

127.    CHEVRON CORPORATION, PHILLIPS 66, CHEVRON USA, PHILLIPS 66 COMPANY, CHEVRON PHILLIPS LLC, and CHEVRON PHILLIPS LP operate under a contribution assumption agreement.

## JURISDICTION & VENUE

128.    This Court has subject matter jurisdiction over this action because diversity

jurisdiction exists under 28 U.S.C. § 1332(a)(3).

129. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Plaintiff seeks an amount that exceeds this sum or value on each of his claims against each Defendant.

130. Complete diversity exists because this is an action between citizens of different states in which a citizen or subject of a foreign state is an additional party, in that:

      a.     Plaintiff is a citizen of the State of Mississippi;

      b.     SYNGENTA AG is a citizen of Switzerland;

      c.     SYNGENTA CROP PROTECTION AG is a citizen of Switzerland;

      d.     SYGENTA CROP PROTECTION LLC is a citizen of the States of Delaware and Mississippi;

      e.     SYNGENTA CORPORATION is a citizen of the States of Delaware and Mississippi;

      f.     CHEVRON LP is a citizen of the States of Delaware and Texas;

      g.     CHEVRON LLC is a citizen of the States of Delaware and Texas;

      h.     CHEVRON USA is a citizen of the Commonwealth of Pennsylvania and the State of California;

      i.     CHEVRON CORPORATION is a citizen of the States of Delaware and California;

      j.     PHILLIPS 66 is a citizen of the States of Delaware and Texas; and PHILLIPS 66 COMPANY is a citizen of the States of Delaware and Texas.

131. This Court has personal jurisdiction over each of the Defendants in this diversity case because a state court in the State of Mississippi would have such jurisdiction under Mississippi Code § 93-11-67, in that:

a.      Over a period of two (Chevron) to six (Syngenta) decades, each Defendant and/or its predecessor(s), together with those with whom they were acting in concert, manufactured paraquat for use as an active ingredient in Paraquat Products, distributed paraquat to formulators of Paraquat Products, formulated Paraquat Products, marketed Paraquat Products to the Mississippi agricultural community, and/or distributed Paraquat Products, intending that such products regularly would be, and knowing they regularly were, sold and used in the State of Mississippi, and in fact were used by Plaintiff, all of which establishes a close relationship between the defendants, the State of Mississippi, and this litigation;

b.      Plaintiff's claims against each Defendant arise out of these contacts between the Defendant and/or its predecessor(s), together with those with whom they were acting in concert, with the State of Mississippi; and

c.      These contacts between each Defendant and/or its predecessors, together with those with whom they were acting in concert, and the State of Mississippi, were so regular, frequent, and sustained as to provide fair warning that it might be hauled into court there, such that requiring it to defend this action in the State of Mississippi does not offend traditional notions of fair play and substantial justice.

132.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district, in that the claims arise from injuries caused by the exposure of Plaintiff Scott Vincent to paraquat from Paraquat Products that were distributed and sold for use in this district, were purchased or purchased for use in this district, and were being used in this district when the exposures that caused the injuries occurred.

## FACTS

22

**A.      Overview of Paraquat**

133.    Defendants' Paraquat Products have been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' Paraquat Products for these purposes was intended or directed by, or reasonably foreseeable to, and was known to or foreseen by Defendants.

134.    Defendants' Paraquat Products were commonly used multiple times per year on the same ground, particularly when used to control weeds in orchards and in farm fields where multiple crops are planted in the same growing season or year. At all relevant times, the use of Defendants' Paraquat Products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by Defendants.

135.    Defendants' Paraquat Products were typically sold to end users in the form of liquid concentrates that were then diluted with water in the tank of a sprayer and applied by spraying the diluted product onto target weeds. At all relevant times, the use of Defendants' Paraquat Products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, the Defendants.

136.    Defendants' Paraquat Products were typically formulated with a surfactant or surfactants, and/or a surfactant, surfactant product, or "crop oil," which typically contains one or more surfactants, was commonly added by users of Defendants' Paraquat Products, to increase the ability of paraquat to stay in contact with and penetrate the leaves of target plants and enter plant cells. At all relevant times, the use of Defendants' Paraquat Products as so formulated and/or with such substances added was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, the Defendants.

137.    Knapsack sprayers, hand-held sprayers, aircraft (i.e., crop dusters), trucks with

23

attached pressurized tanks, and tractor-drawn pressurized tanks, were commonly used to apply Defendants' Paraquat Products. At all relevant times, the use of such equipment for that purpose was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, the Defendants.

138.    When Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, the Defendants, persons who used them and others nearby were commonly exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by Defendants that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

139.    When Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants persons who sprayed them, and others nearby while they were being sprayed or when they recently had been sprayed, commonly were exposed to paraquat, including as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind) and contact with sprayed plants. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by Defendants that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

140.    When Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants, persons who used them and other persons nearby commonly were exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or

cleaned or clogged spray nozzles, lines, or valves were being cleared. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

141.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat could and did enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present, and that paraquat that entered the human body in one or more of these ways would and did create a substantial risk of harm to people so exposed.

142.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat could and did enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurs, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

143.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat could and did enter the

25

human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

144.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat that entered the human body via ingestion into the digestive tract could and did enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract), and that paraquat that entered the enteric nervous system would and did create a substantial risk of harm to people so exposed.

145.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat that entered the human body, whether via absorption, respiration, or ingestion, could and did enter the bloodstream, and that paraquat that entered the bloodstream would and did create a substantial risk of harm to people so exposed.

146.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants, and people were exposed to paraquat as a result, paraquat that entered the bloodstream could and did enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier, and that paraquat that entered the brain would and

26

did create a substantial risk of harm to people so exposed.

147. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat that entered the nose and nasal passages could and did enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier, and that paraquat that entered the olfactory bulb would and did create a substantial risk of harm to people so exposed.

148. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to Paraquat Products that contained surfactants or had surfactants added to them, the surfactants would and did increase the toxicity of paraquat toxicity to humans by increasing its ability to stay in contact with or penetrate cells and cellular structures, including but not limited to the skin, mucous membranes, and other epithelial and endothelial tissues, including tissues of the mouth, nose and nasal passages, trachea, conducting airways, lungs, gastrointestinal tract, blood-brain barrier, and neurons, and that this would and did increase the already substantial risk of harm to people so exposed.

**B.** **History of Paraquat Development, Manufacture, Distribution, and Sale**

149. ICI Limited, a predecessor company of Syngenta, discovered the herbicidal properties of paraquat in the mid-1950s; developed herbicide formulations containing paraquat as an active ingredient in the early 1960s; and produced the first commercial paraquat formulation, which it registered it in England and introduced in certain markets under the brand

name GRAMOXONE®, in 1962.

150.    ICI Limited was awarded a U.S. patent on herbicide formulations containing paraquat as an active ingredient in 1962.

151.    In May 1964, ICI Limited, PP Limited, and the Chevron Defendants entered into an agreement for the distribution of paraquat in the U.S. and the licensing of certain paraquat-related patents, trade secrets, and other intellectual property ("paraquat licensing and distribution agreement").

152.    As a result of the May 1964 paraquat licensing and distribution agreement, paraquat became commercially available for use in the U.S. in or about 1965.

153.    In April 1975, ICI Limited, ICI US, and CHEVRON entered into a new paraquat licensing and distribution agreement that superseded the May 1964 agreement.

154.    In November 1981, ICIA, CHEVRON, and ICI PLC entered into a new paraquat licensing and distribution agreement, effective January 1982, which superseded in part and amended in part the April 1975 agreement.

155.    From approximately May 1964 through approximately September 1986, pursuant to these paraquat licensing and distribution agreements, ICI and CHEVRON acted in concert in all aspects of the U.S. paraquat business.

156.    In September 1986, ICI and CHEVRON entered into an agreement terminating their paraquat licensing and distribution agreement.

157.    Under the September 1986 termination agreement, ICI paid CHEVRON for the early termination of CHEVRON's rights under their paraquat licensing and distribution agreement.

158.    Although the September 1986 termination agreement gave ICI the right to buy, or exchange for ICI-labeled Paraquat Products, CHEVRON-labeled Paraquat Products that

28

CHEVRON had already sold to its distributors, CHEVRON-labeled Paraquat Products continued to be sold for use in the U.S. after this agreement for some period of time unknown to Plaintiff.

159. SYNGENTA AG, SYNGENTA AG's predecessors, and subsidiaries of SYNGENTA AG and its predecessors (collectively, "SYNGENTA"), have at all relevant times manufactured more paraquat used as an active ingredient in Paraquat Products formulated and distributed for sale and use in the U.S., including Mississippi, than all other paraquat manufacturers combined.

160. From the mid-1960s through at least 1986, SYNGENTA (as ICI) was the only manufacturer of paraquat used as an active ingredient in Paraquat Products formulated and distributed for sale and use in the U.S., including Mississippi.

161. From approximately September 1986 through the present, SYNGENTA has:

a. manufactured paraquat for use as an active ingredient in Paraquat Products formulated and distributed for sale and use in the U.S., including Mississippi;

b. distributed paraquat for use as an active ingredient in Paraquat Products formulated and distributed for sale and use in the U.S., including Mississippi;

c. formulated Paraquat Products distributed for sale and use in the U.S., including Mississippi; and

d. distributed Paraquat Products for sale and use in the U.S., including Mississippi.

**C.      Overview of Parkinson's**

162. Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

163. Scientists who study Parkinson's disease generally agree that fewer than 10% of

all Parkinson's disease cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

164.    The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

165.    Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

166.    Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

167.    There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression, and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

168.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of Parkinson's disease.

169.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

170.     The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

171.     Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

172.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

173.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

174.     Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

**D.      History of Paraquat Development, Manufacture, Distribution, and Sale**

175.     Paraquat is highly toxic to both plants and animals because it causes and contributes to the degeneration and death of living cells.

176.     Paraquat causes and contributes to the degeneration and death of plant and animal cells both directly, through oxidation, and indirectly, through oxidative stress created or aggravated by the "redox cycling" of paraquat; these processes damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells, and interfere with cellular functions—in plant cells, with photosynthesis, and in animal cells, with cellular respiration—that are essential to cellular health.

31

177.    In both plant and animal cells, paraquat undergoes redox cycling that creates or aggravates oxidative stress because of the "redox properties" inherent in paraquat's chemical composition and structure: paraquat is both a strong oxidant and has a high propensity to undergo redox cycling, and to do so repeatedly, in the presence of a suitable reductant and molecular oxygen, both of which are present in all living cells.

178.    The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can and often does initiate a cascading series of chemical reactions that can and often do create other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells.

179.    Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical. After even a tiny amount of paraquat enters the human brain, paraquat molecules continue to undergo redox cycling and continue to cause damage to human brain cells. This repeated cycling continues in the presence of oxygen and continues to cause the death of dopaminergic neurons, eventually resulting in the onset of Parkinson's disease. However, even after the onset of Parkinson's disease, the redox cycling continues to cause brain cell damage and death for as long as the victim lives.

180.    The oxidation and redox potentials of paraquat have been known to science since at least the 1930s, and in the exercise of ordinary care should have been known, and were known, to Defendants at all relevant times.

181.    That paraquat is highly toxic to all living cells—both plant cells and all types of animal cells—has been known in the scientific community since at least the mid-1960s, and in the exercise of ordinary care should have been known, and was known, by Defendants at all

relevanttimes.

182.     The high toxicity of paraquat to living cells of all types creates a substantial risk of harm to persons exposed to paraquat, which Defendants should have known in the exercise of ordinary care, and did know, at all relevant times.

183.     The same oxidation and redox potentials that make paraquat highly toxic to plant cells and other types of animal cells make paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk of neurotoxic harm to persons exposed to paraquat. Defendants should have known this in the exercise of ordinary care, and did know this, at all relevant times.

**E.     Science Linking Paraquat to Parkinson's**

184.     The same redox properties that make paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons. Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

185.     Although Parkinson's disease is not known to occur naturally in any species other than humans, Parkinson's disease research is often performed using "animal models," in which scientists artificially produce in laboratory animals conditions that show features characteristic of Parkinson's disease in humans.

186.     Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease.

187.     In animal models of Parkinson's disease, hundreds of studies involving various routes of exposure have found that paraquat causes the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in

human Parkinson's disease.

188. Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that paraquat causes the degeneration and death of dopaminergic neurons.

189. Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and Parkinson's disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's disease in populations with occupational exposure to paraquat compared to populations without such exposure.

190. A population-based study of residents of rural California with historical pesticide use in the area published in 2009 concluded that "consumption of well water potentially contaminated with pesticides may play a role in the etiology of [Parkinson's disease]." Nicole M. Gatto et al. *Well-Water Consumption and Parkinson's Disease in Rural California*, 117 Envir. Health Perspective 1912 (2009).

191. In another population-based study published in 2011, scientists further investigated the link between paraquat and Parkinson's. The authors stated "[o]ur findings, considered together with earlier results, suggest that paraquat use plays a role in human [Parkinson's]." Caroline M. Tanner et al., *Rotenone, Paraquat, and Parkinson's Disease*, 119 Environ. Health Perspectives 866 (2011).

192. A 2017 study found that paraquat was associated with Parkinson's and that "paraquat exposure was found to impair mitochondrial respiration and increase mtDNA damage in in vivo and in vitro systems." Laurie H. Saunders et al., *Editor's Highlight: Base Excision Repair Variants and Pesticide Exposure Increase Parkinson's Disease*, 158 Tox. Science. 188 (2017).

34

**F.      Regulation of Paraquat in the United States**

193.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §

136 et seq., which regulates the distribution, sale, and use of pesticides within the United States,

requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except

as described by FIFRA. 7 U.S.C. 136(a).

194.    Registration by the EPA, however, is not an assurance or finding of safety. The

determination the EPA makes in registering or re-registering a product is not that the product is

"safe," but rather that use of the product in accordance with its label directions "will not

generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

195.    As part of the pesticide registration process, the EPA requires, among other

things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and

other potential non-target organisms, and other adverse effects on the environment.

196.    As a general rule, FIFRA requires registrants—not the EPA—to perform health

and safety testing of pesticides, and the EPA generally does not perform such testing.

197.    The EPA registers (or re-registers) a pesticide if it believes, based largely on

studies and data submitted by the registrant, that:

        a.      its composition is such as to warrant the proposed claims for it, 7 U.S.C.

§136a(c)(5)(A);

        b.      its labeling and other material required to be submitted comply with the

requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

        c.      it will perform its intended function without unreasonable adverse

effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

        d.      when used in accordance with widespread and commonly recognized

practice it will not generally cause unreasonable adverse effects on the environment, 7

U.S.C. § 136a(c)(5)(D).

198.   FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

199.   Under FIFRA, "As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

200.   However, FIFRA further provides that "In no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

201.   FIFRA further provides that "...it shall be unlawful for any person in any State to distribute or sell to any person... any pesticide which is... misbranded." 7 U.S.C. §136j(a)(1)(E).

202.   A pesticide is misbranded under FIFRA if, among other things:

a.      its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

b.      the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

c.      the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

36

203.    Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this Complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA.

204.    Plaintiff brings claims and seek relief in this action only under state law. Plaintiff does not bring any claims or seek any relief in this action under FIFRA.

**G.      Regulation of Paraquat Internationally**

205.    Paraquat has been banned in more than 55 (fifty-five) countries across the world.

206.    In July 2007, the European Union banned the use of Paraquat and found that Paraquat should not have been included on a list of approved substances because the evidence "fails to satisfy the requirement of protection of human and animal health." Court of First Instance of the European Communities, *Press Release No. 45/07, The Court of First Instance Annuls the Directive Authorising Paraquat as an Active Plant Protection Substance* (July 11, 2007).

**H.      Plaintiff's Use of Paraquat & Diagnosis of Parkinson's**

207.    Between approximately 1966 and 2014, Plaintiff Scott Vincent was repeatedly exposed to and inhaled, ingested, or absorbed paraquat in the course of applying Paraquat Products, including Gramaxone, on the ground or in the air to desiccate crops for harvest or during spring burndown before planting on fields in Coahoma County, Mississippi. Plaintiff

37

Vincent was also repeatedly exposed to and inhaled, ingested, or absorbed paraquat in the course and scope of his and his family's owning, maintaining and caring for cattle and horses.

208. Plaintiff Scott Vincent was certified by the State of Mississippi to apply Paraquat Products on farmland.

209. On information and belief during this time period, Defendants manufactured and sold the paraquat that the owners or operators of farms applied or had applied on farms in Counties within the Northern District of Mississippi, including Coahoma County.

210. After repeated and consistent paraquat exposure, Plaintiff Scott Vincent began suffering neurological injuries consistent with Parkinson's disease and was diagnosed with Parkinson's disease in or about 2014. Plaintiff's neurological injuries have continued and progressed over time, and Plaintiff suffers these injuries at present and will continue to suffer these injuries into the future.

211. Each of the Defendants knew or should have known of the risk of neurological injuries to persons who used paraquat, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed and fraudulently concealed said risk.

212. Before the year 2021, Plaintiff did not know nor had any reason to know of the association between Parkinson's disease and exposure to paraquat or Paraquat Products.

213. No doctor or any other person told Plaintiff before the year 2021 that his injuries were or could have been caused by exposure to paraquat.

214. Before the year 2021, Plaintiff had never read, viewed, or heard of any articles in newspapers, scientific journals, or other publications that associated Parkinson's disease with paraquat.

215. Before the year 2021, Plaintiff had never read, viewed, or heard of any lawsuit

alleging that paraquat causes Parkinson's disease.

216.    At no time when using paraquat himself was Plaintiff aware that exposure to paraquat could cause any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to paraquat.

217.    The paraquat to which Plaintiff was exposed was sold and used in Mississippi, and was manufactured, distributed, and/or sold by one or more of the Defendants and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in Mississippi.

218.    On information and belief, Plaintiff was exposed to Paraquat Products that were sold and used in Mississippi, and were designed, manufactured, distributed, and/or sold by the SYNGENTA DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in Mississippi.

219.    On information and belief, Plaintiff was exposed to Paraquat Products that were sold and used in Mississippi, and were designed, manufactured, distributed, and/or sold by the CHEVRON DEFENDANTS, and others with whom they acted in concert, intending or expecting that it would be sold and used in Mississippi.

## CAUSES OF ACTION

### COUNT ONE
### STRICT PRODUCT LIABILITY – DESIGN DEFECT
### AGAINST THE SYNGENTA DEFENDANTS

220.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully setforth herein and further alleges:

221.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of

39

designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Mississippi.

222. Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

223. The Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous, in that when used in the intended and directed manner or a reasonably foreseeable manner:

      a. it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      b. when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

224. This defective condition existed in the Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed when it left the control of

Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

225.    As a result of this defective condition, the Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

226.    The Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

227.    As a direct and proximate result of the defective and unreasonably dangerous condition of the paraquat manufactured, distributed, and sold by the SYNGENTA DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

228.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against Defendants the SYNGENTA DEFENDANTS, jointly and severally, in an amount in

41

excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## COUNT TWO
## STRICT PRODUCT LIABILITY – FAILURE TO WARN
## AGAINST THE SYNGENTA DEFENDANTS

229. Plaintiff incorporates all allegations in the preceding paragraphs as if fully setforth herein and further alleges:

230. At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Mississippi.

231. Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

232. When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the Paraquat Products to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner or a reasonably foreseeable manner:

a. it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

42

b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause, potentiate, promote, or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

233.    The Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

a.    it was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.    it did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect those exposed from the risk of neurological damage.

234.    This defective condition existed in the Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

43

235. As a result of this defective condition, the Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

236. The Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

237. As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by the SYNGENTA DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

238. Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against the SYNGENTA DEFENDANTS, jointly and severally, in an amount in excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

44

**COUNT THREE**
**NEGLIGENCE**
**AGAINST THE SYNGENTA DEFENDANTS**

239.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

240.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Mississippi.

241.    Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

242.    The Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

243.    At all times relevant to this claim, in designing, manufacturing, packaging, labeling, distributing, and selling Paraquat Products, and in acting in concert with others who did so, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including Plaintiff.

244.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the

Paraquat Products to which Plaintiff was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary case should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

     a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

     b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause, potentiate, promote, or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

245.    In breach of the aforementioned duty to Plaintiff, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently in that they:

     a.    designed, manufactured, formulated, and packaged paraquat in a manner that made it likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

     b.    designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near

46

where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

     c.     performed inadequate testing or otherwise failed to perform any testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

     d.     performed inadequate testing or otherwise failed to perform any testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

     e.     performed inadequate testing or otherwise failed to perform any testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

     f.     performed inadequate testing or otherwise failed to perform testing to determine the extent to which paraquat, when formulated or mixed with surfactants or

47

other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

g.    directed that paraquat be used in a manner that made it likely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h.    failed to design and provide a warning or caution statement, which was necessary and, if complied with, was adequate to protect those exposed from the risk of neurological damage.

246.    As a direct and proximate result of the negligence of the SYNGENTA DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

247.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against the SYNGENTA DEFENDANTS, jointly and severally, in an amount in excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT FOUR**
**PUBLIC NUISANCE**
**AGAINST THE SYNGENTA DEFENDANTS**

248.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

249.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Mississippi.

250.    Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

251.    The Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

252.    At all times relevant to this claim, Plaintiff had the right to a healthful environment while living and working in the State of Mississippi.

253.    At all times relevant to this claim, Defendants, Defendants' corporate

49

predecessors, and others with whom they acted in concert owed a duty to the public, including Plaintiff and other persons whom they could reasonably foresee were likely to be in or near places where paraquat was being or recently had been used within the State of Mississippi, to provide and maintain a healthful environment in connection with their design, manufacture, distribution, and sale of pesticides, including Paraquat Products, in or for use within the State of Mississippi.

254. When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the Paraquat Products to which Plaintiff was exposed, it was reasonably foreseeable to Defendants, Defendants' corporate predecessors, and others with whom they acted in concert that Plaintiff and other members of the public were likely to be in or near places where paraquat was being or recently had been used.

255. When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the Paraquat Products to which Plaintiff was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

    a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or

contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

256.    In breach of the aforementioned duty to members of the public, including Plaintiff, in manufacturing, distributing, and selling Paraquat Products for use in the State of Mississippi, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently, in that they:

> a.    designed, manufactured, formulated, and packaged paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

> b.    designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

> c.    performed inadequate testing or otherwise failed to perform any testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

> d.    performed inadequate testing or otherwise failed to perform any testing to

51

determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.     performed inadequate testing or otherwise failed to perform any testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

f.     performed inadequate testing or otherwise failed to perform any testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

g.     directed that paraquat be used in a manner that made it likely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or

52

areas near where it had been sprayed; and

     h.    failed to design and provide a warning or caution statement that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

257.    As a direct and proximate result of the public nuisance created by the SYNGENTA DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

258.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against the SYNGENTA DEFENDANTS, jointly and severally, in an amount in excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT FIVE**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**AGAINST THE SYNGENTA DEFENDANTS**

259.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

260.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling Paraquat Products and held themselves out as having knowledge or skill regarding Paraquat Products.

261.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Mississippi.

262.    Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

263.    At the time of each sale of Paraquat Products to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used.

264.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached this warranty regarding each sale of Paraquat Products to which Plaintiff was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

        a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who

were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and,

      b.     when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

265.    As a direct and proximate result of the breaches of the implied warranty of merchantability by the SYNGENTA DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

266.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against the SYNGENTA DEFENDANTS, jointly and severally, in an amount in excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT SIX**
**STRICT PRODUCT LIABILITY – DESIGN DEFECT**
**AGAINST THE CHEVRON DEFENDANTS**

267.     Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

268.     At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used inMississippi.

269.     Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

270.     The Paraquat Products that Defendants, Defendants' corporate predecessors, andothers with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous, inthat when used in the intended and directed manner or a reasonably foreseeable manner:

    a.     it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;and

    b.     when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or

contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

271. This defective condition existed in the Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

272. As a result of this defective condition, the Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

273. The Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

274. As a direct and proximate result of the defective and unreasonably dangerous condition of the paraquat manufactured, distributed and sold by the CHEVRON DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his

57

life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

275.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against the CHEVRON DEFENDANTS, jointly and severally, in an amount in excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT SEVEN**
**STRICT PRODUCT LIABILITY – FAILURE TO WARN**
**AGAINST THE CHEVRON DEFENDANTS**

276.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

277.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Mississippi.

278.    Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

279.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the Paraquat Products to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with

whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner or a reasonably foreseeable manner:

     a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

     b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was

     c.    likely to cause, potentiate, promote, or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

280.    The Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

     a.    it was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

     b.    it did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect those exposed from the risk of neurological

damage.

281. This defective condition existed in the Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

282. As a result of this defective condition, the Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

283. The Paraquat Products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

284. As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by the CHEVRON DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

60

285.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against the CHEVRON DEFENDANTS, jointly and severally, in an amount in excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT EIGHT**
**NEGLIGENCE**
**AGAINST THE CHEVRON DEFENDANTS**

286.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

287.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used inMississippi.

288.    Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

289.    The Paraquat Products that Defendants, Defendants' corporate predecessors, andothers with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

290.    At all times relevant to this claim, in designing, manufacturing, packaging,

labeling, distributing, and selling Paraquat Products, and in acting in concert with others who did so, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including Plaintiff.

291.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the Paraquat Products to which Plaintiff was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary case should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

   a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

   b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause, potentiate, promote, or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

292.    In breach of the aforementioned duty to Plaintiff, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently in that they:

   a.    designed, manufactured, formulated, and packaged paraquat in a manner

that made it likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b.        designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

c.        performed inadequate testing or otherwise failed to perform any testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.        performed inadequate testing or otherwise failed to perform any testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.        performed inadequate testing or otherwise failed to perform any testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was

63

likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

f.      performed inadequate testing or otherwise failed to perform testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

g.      directed that paraquat be used in a manner that made it likely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h.      failed to design and provide a warning or caution statement, which was necessary and, if complied with, was adequate to protect those exposed from the risk of neurological damage.

293.     As a direct and proximate result of the negligence of the CHEVRON DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has

suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

294.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against the CHEVRON DEFENDANTS, jointly and severally, in an amount in excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## COUNT NINE
## PUBLIC NUISANCE
## AGAINST THE CHEVRON DEFENDANTS

295.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

296.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Mississippi.

297.    Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

298.    The Paraquat Products that Defendants, Defendants' corporate predecessors, and

others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

299. At all times relevant to this claim, Plaintiff had the right to a healthful environment while living and working in the State of Mississippi.

300. At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to the public, including Plaintiff and other persons whom they could reasonably foresee were likely to be in or near places where paraquat was being or recently had been used within the State of Mississippi, to provide and maintain a healthful environment in connection with their design, manufacture, distribution, and sale of pesticides, including Paraquat Products, in or for use within the State of Mississippi.

301. When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the Paraquat Products to which Plaintiff was exposed, it was reasonably foreseeable to Defendants, Defendants' corporate predecessors, and others with whom they acted in concert that Plaintiff and other members of the public were likely to be in or near places where paraquat was being or recently had been used.

302. When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the Paraquat Products to which Plaintiff was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

      a.     it was designed, manufactured, formulated, and packaged such that it was

likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;and

  b.  when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

303. In breach of the aforementioned duty to members of the public, including Plaintiff, in manufacturing, distributing, and selling Paraquat Products for use in the State of Mississippi, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently, in that they:

  a.  designed, manufactured, formulated, and packaged paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

  b.  designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

c.      performed inadequate testing or otherwise failed to perform any testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.      performed inadequate testing or otherwise failed to perform any testing to determine the extent to which paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.      performed inadequate testing or otherwise failed to perform any testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

f.      performed inadequate testing or otherwise failed to perform any testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was

68

both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure;

      g.    directed that paraquat be used in a manner that made it likely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      h.    failed to design and provide a warning or caution statement that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

304.    As a direct and proximate result of the public nuisance created by the CHEVRON DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

305.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against the CHEVRON DEFENDANTS, jointly and severally, in an amount in excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## COUNT TEN
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## AGAINST THE CHEVRON DEFENDANTS

306.    Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

307.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling Paraquat Products and held themselves out as having knowledge or skill regarding Paraquat Products.

308.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Mississippi.

309.    Plaintiff was exposed to Paraquat Products sold and used in Mississippi that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Mississippi.

310.    At the time of each sale of Paraquat Products to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used.

311.    Defendants, Defendants' corporate predecessors, and others with whom they

acted in concert breached this warranty regarding each sale of Paraquat Products to which Plaintiff was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

        a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

        b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop long after exposure.

312.    As a direct and proximate result of the breaches of the implied warranty of merchantability by the CHEVRON DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

313.    Defendants' intentional disregard for the safety of users of paraquat, including Plaintiff, justifies an award of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and

against the CHEVRON DEFENDANTS, jointly and severally, in an amount in excess of $75,000 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## PRAYER FOR RELIEF

Plaintiff demands judgment in his favor and seeks the following relief against Defendants, jointly and severally:

A.  Compensatory damages in excess of $75,000, exclusive of interest and costs;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Reasonable attorneys' fees as allowed by law;

E.  Punitive damages in an amount to punish Defendants and encourage Defendants and others from similar conduct; and

F.  Such other relief as this Court deems just and proper under the circumstances.

## JURY DEMAND

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial as to all issues triable by a jury.


DATED:  October 8, 2021                    RESPECTFULLY SUBMITTED,

                                           DAVIDSON BOWIE, PLLC


                                           */s/ John L. Davidson*
                                           John L. Davidson, MS Bar No. 9073
                                           DAVIDSON BOWIE, PLLC
                                           1062 Highland Colony Pkwy, Ste 275
                                           Ridgeland, Mississippi 39157
                                           Telephone:(601) 932-0028
                                           jdavidson@dbslawfirm.net